IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EDWIN O'CONNER, | ) | CASE NO. 4:13-cv-00072 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Edwin O'Conner ("Plaintiff" or "O'Conner") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to

the consent of the parties. Doc. 16.   For the reasons set forth herein, the Court **AFFIRMS** the

Commissioner's decision.

## I.  Procedural History

O'Conner filed applications for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") on March 9, 2010.  Tr. 159, 166.  He alleged a disability onset date of

May 1, 2007 (Tr. 159, 166, 214), and claimed disability based on seizures, torn ligaments in right

foot, ADD, speech impairment, learning disability, gall stone surgery, and sleep disturbances (Tr.

104, 113, 121, 125, 128, 132).  After initial denial by the state agency (Tr. 96-97, 104-119), and

denial upon reconsideration (Tr. 98-99, 121-134), O'Conner requested a hearing (Tr. 135-137).

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R.
CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

On August 12, 2011, Administrative Law Judge James A. Hill ("ALJ") conducted an administrative hearing.  Tr. 37-66.

In his August 24, 2011, decision (Tr. 18-36), the ALJ determined that O'Conner had not been under a disability from May 1, 2007, through the date of the decision.  Tr. 31.  O'Conner requested review of the ALJ's decision by the Appeals Council.  Tr. 17.  On November 23, 2012, the Appeals Council denied O'Conner's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.  Personal, educational and vocational evidence

O'Conner was born in 1968.  Tr. 43, 159, 166.  As of the date of the hearing, O'Conner was 42 years of age.  Tr. 43.  O'Conner was married.  Tr. 44.  His wife was not working.  Tr. 44.  He was residing with his wife and two sons who were ages 5 and 11.  Tr. 51.

O'Conner attended special education classes while in school.  Tr. 44, 53.  He graduated from high school.  Tr. 44, 53.  He testified that he cannot read.  Tr. 44.  He indicated that he does not know how many minutes are in an hour, how many hours are in a day, or how many months are in a year.  Tr. 58.  As a youth, O'Conner was in juvenile detention.[2]  Tr. 53-54.

While in school, O'Conner had three sets of intelligence test scores.  Tr. 204, 562.  On June 27, 1984, when in 9th grade, O'Conner's IQ scores included a Verbal IQ score of 62, Performance IQ score of 75, and Full Scale IQ score of 68.  Tr. 204, 562.  Prior to that, in 1974, O'Conner had a Full Scale IQ score of 59 and, in 1979, he had a Full Scale IQ of 68.  Tr. 562.  As part of his 2007 consultative examination, O'Conner underwent intelligence testing, which

---

[2] School records reflect juvenile court involvement (Tr. 192), excessive absences (Tr. 193-94), and incidents of fighting at school (Tr. 199-202).  However, it is unclear from the record or O'Conner's testimony (Tr. 53-54) why he was in juvenile detention.

resulted in a Verbal IQ score of 60, Performance IQ score of 76, and a Full Scale IQ score of 64.
Tr. 462, 469.

He has worked as a dishwasher at a restaurant and a dock worker at a thrift store.  Tr. 45.
As a dock worker, he unloaded trucks and he would also accompany a driver to pick up furniture
from individuals.  Tr. 45.   He held his job at the thrift store from about 1997 through 2007.
Tr.171-72, 227.

**B.      Medical evidence[3]**

   **1.   State agency consultative psychologists[4]**

      **a.   John J. Brescia, M.A.**

On December 26, 2007, psychologist John J. Brescia conducted a psychological
evaluation.  Tr. 462-71.  Dr. Brescia conducted a clinical interview and administered the
Wechsler Adult Intelligence Scale – Third Edition (WAIS – III) psychological test.  Tr. 462.
O'Conner appeared for the evaluation with his wife, his wife's step-father, and three year-old
son.  Tr. 462.  He presented in an unkempt and disheveled manner.  Tr. 462.  He interacted in a
friendly and cooperative manner.  Tr. 466.

O'Conner expressed himself in a generally lucid and coherent manner.  Tr. 465.  He
provided concrete and relevant responses to questions but was uncertain with respect to much of
the information requested of him and had to rely on his wife to supply information.  Tr. 465.
O'Conner showed signs of a mild speech impairment but Dr. Brescia indicated that he had no
difficulty understanding him. Tr. 465.  The content of O'Conner's conversation made him come
across as very limited intellectually.  Tr. 465.

---

[3] The records that pertain to Plaintiff's claim that the ALJ erred in finding that he did not satisfy Listing 12.05C are
summarized herein.

[4] O'Conner underwent three separate consultative examinations which are summarized herein.

O'Conner indicated that his memory was not great; his wife indicated that she has to remind him of his appointments.  Tr. 467-68.  O'Conner indicated that his concentration was good and he usually could keep his mind on what he was doing.  Tr. 468.  Dr. Brescia indicated that O'Conner's responses to questions posed to assess his cognitive functioning showed that O'Conner's cognitive functioning was significantly diminished.  Tr. 468.  For example, he reported that he did not know how many months or weeks there are in a year; he did not know what a thermometer was; he did not know who the president or past presidents were; he could not interpret various proverbs.  Tr. 468.

O'Conner indicated an awareness of his learning problems and seizure disorder and did not present himself as seriously maladjusted socially or emotionally and appeared to react primarily to situational stressors.  Tr. 468.  His judgment appeared to be very limited because of his diminished cognitive functioning.  Tr. 468.

O'Conner indicated that he spends most of his time at home, playing with his children.  Tr. 469.  He watches television and listens to music.  Tr. 469.  He might work on trucks at his father-in-law's house.  Tr. 469.  He assists with chores around the house.  Tr. 469.  For example, he sweeps, does dishes and takes out the trash.  Tr. 469.  His wife does laundry and cooking.  Tr. 469.  He reported being able to shop on his own with lists provided by his wife.  Tr. 469.  He indicated that he had friends with whom he socializes.  Tr. 469.

The WAIS-III testing resulted in a Full Scale IQ score of 64; a Component Verbal IQ score of 60; and a Performance IQ score of 76.  Tr. 469.   Dr. Brescia's summary and conclusions with respect to the WAIS-III testing stated in part that:

> The claimant scored within the extremely low range of intelligence on the current WAIS-III administration.  He exhibited deficits in most areas assessed.  He scored significantly higher on the Performance than the Verbal section of this instrument.

4

> Notwithstanding any physical limitations, results of this evaluation indicate that the claimant is mildly to moderately impaired in the ability to relate to others, including fellow workers and supervisors in a job situation.  He came across as friendly and cooperative during the session, and did not acknowledge any interpersonal problems or conflicts during the interview.  His cognitive deficits, however, could introduce problems in an employment setting with communication and comprehension.
>
> The claimant is able to understand and follow simple instructions.  Because of his cognitive deficits, he could not be expected to understand or implement more complex or detailed tasks.
>
> The claimant has the ability to maintain the attention to perform simple, repetitive tasks.  His concentration ad [sic] attention were generally adequate on the current occasion, and he did not report difficulty in these areas during the interview.
>
> The claimant is moderately impaired in the ability to withstand stress and pressures associated with day-to-day work activity.  He does not report or exhibit signs of depression or anxiety, but he does lack in understanding, and may not always react adaptively or appropriately to situational stressors.  He seems to need fairly concrete guidance in what to do, and does not react well to the perception that people are "pushing" him.

Tr. 470-71.  Dr. Brescia's diagnoses included a diagnosis of mild mental retardation (claimant exhibits significantly sub-average general intelligence, with concurrent deficits in adaptive functioning) (Axis II).[5] Tr. 471.  Dr. Brescia concluded that O'Conner had a final GAF score of 55.[6]  Tr. 471.

### b.  Donald Degli, M.A.

On August 18, 2009, psychologist Donald Degli conducted a psychological evaluation.  Tr. 562-64.  O'Conner's mother-in-law drove him to the evaluation and chose to wait in the car.  Tr. 562.  O'Conner's wife also accompanied him to the evaluation and waited in the waiting room.  Tr. 562.

---

[5] Dr. Brescia provided no diagnosis under Axis I.  Tr. 471.

[6] GAF( Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

As part of the evaluation, Dr. Degli conducted a clinical interview and reviewed past records and reports, including Dr. Brescia's psychological evaluation and past psychological testing test scores from 1974 (WPPSI Full Scale IQ 59), 1979 (WISC-R Full Scale IQ 68), and 1984 (WISC-R Full Scale IQ 68).  Tr. 562.

O'Conner was residing with his wife and two sons in a rental home that they had been renting for about one month.  Tr. 562.  Prior to residing in that home, they had rented another house for approximately 17 years.  Tr. 562.  O'Conner had been employed at the St. Vincent DePaul Society store for 15 years until it closed.  Tr. 562.

While his vocabulary was limited, O'Conner was easy to engage in conversation; he was responsive; he maintained good eye contact; and his speech was not pressured.  Tr. 563.  Dr. Degli noted that O'Conner's history indicated that, at best, he functioned in the upper range of mild mental retardation but stated that his adaptive functioning has been above that level.  Tr. 563.  He was married; he was meeting child rearing responsibilities; and he was previously gainfully employed in a rather simple setting but was nonetheless functional.  Tr. 563.  Based on O'Conner's inability to perform some intellectual tasks, Dr. Degli noted that O'Conner showed intellectual deficiency but also noted that his level of adaptive functioning had at worst been in the borderline range.  Tr. 563.  Dr. Degli also noted that O'Conner had learning disabilities.  Tr. 563.

Notwithstanding his intellectual deficiency, O'Conner had shown that he had adequate insight and judgment.  Tr. 563.  O'Conner indicated that, during the day, he spent time doing household chores, playing video games with his children, watching television, and visiting with a few friends.  Tr. 563.

In summary, Dr. Degli concluded in part that:

> Today's intellectual estimates are consistent with an individual who has an intellectual handicap, most of his testing in the past at best in the upper mild mental retardation range. But, with respect to his overall adaptive functioning, married, meeting child rearing responsibilities, holding employment successfully for fifteen years, this claimant has not functioned below the level of borderline intellectual functioning.

Tr. 564.  Dr. Degli's diagnoses included learning disorder NOS (Axis I) and borderline intellectual functioning (Axis II), with a GAF score of 60.  Tr. 564.  Dr. Degli indicated that O'Conner was moderately impaired in his ability to meet the demands of competitive adult employment.  Tr. 564.

### c.  Stanley J. Palumbo, Ph.D.

On May 6, 2010, clinical psychologist Stanley J. Palumbo conducted a psychological evaluation.  Tr. 308-12.  O'Conner's mother-in-law drove him to the interview.  Tr. 308.  O'Conner indicated that he does not want to drive because of his seizures.  Tr. 308.  Dr. Palumbo reviewed the evaluations prepared by Drs. Brescia and Degli as well as the intellectual testing from school which showed full scale IQ scores in the mild mental retardation range.  Tr. 308.

Dr. Palumbo reported that O'Conner showed adequate personal hygiene and was dressed appropriately.  Tr. 309.  O'Conner related appropriately to Dr. Palumbo and was friendly and cooperative.  Tr. 309.  O'Conner's speech was clear and understandable and at a normal pace and volume.  Tr. 309.  His concentration and attention were fair; he never lost his train of thought and did not need to have questions repeated.  Tr. 310.  He was able to identify the current president but unable to identify past presidents.  Tr. 310.  He did not interpret phrases such as "strike when the iron is hot" and "don't count your chickens before they hatch."  Tr. 310.  O'Conner showed insight into his seizure disorder and adequate judgment because he was seeking professional health treatment.  Tr. 310.

O'Conner's daily activities included moving the lawn, washing dishes, some light housecleaning, and accompanying his wife to the grocery store.  Tr. 310.  He does not do the laundry, cook, or grocery shop on his own.  Tr. 310.  He does not attend church because he falls asleep.  Tr. 310.  He and his wife socialize with other couples.  Tr. 310.  He enjoys playing videogames and listening to music.  Tr. 310, 311.  Sometimes he visits his in-laws.  Tr. 310.

Dr. Palumbo's diagnoses included mild mental retardation (Axis II)[7] with a GAF score of 52.  Tr. 311.

### 2.  State agency reviewing psychologists

#### a.  Aracelis Rivera, Psy. D.

On May 12, 2010, psychologist Aracelis Rivera, Psy. D., completed a Mental RFC Assessment (Tr. 321-24) and a Psychiatric Review Technique (Tr. 325-338).

In the Mental RFC, Dr. Rivera rated O'Conner in 20 categories.  Tr. 321-24.  Dr. Rivera found no evidence of limitation in 4 categories: (1) the ability to work in coordination with or proximity to others without being distracted by them; (2) the ability to ask simple questions or request assistance; (3) the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and (4) the ability to be aware of normal hazards and take appropriate precautions.  Tr. 321-22.  Dr. Rivera opined that O'Conner was not significantly limited in 4 categories: (1) the ability to remember locations and work-like procedures; (2) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) the ability to sustain an ordinary routine without special supervision; and (4) the ability to travel in unfamiliar places or use public transportation.  Tr. 321-22.  Dr. Rivera opined that O'Conner was moderately limited in 10 categories: (1) the ability to understand and remember very short and simple instructions; (2) the ability to carry out very

---

[7] Dr. Palumbo provided no diagnosis under Axis I.  Tr. 311.

short and simple instructions; (3) the ability to maintain attention and concentration for extended periods; (4) the ability to make simple work-related decisions; (5) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) the ability to interact appropriately with the general public; (7) the ability to accept instructions and respond appropriately to criticism from supervisors; (8) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (9) the ability to respond appropriately to changes in the  work setting; and (10) the ability to set realistic goals or make plans independently of others.  Tr. 321-22.  Dr. Rivera opined that O'Conner was markedly limited in 2 categories: (1) the ability to understand and remember detailed instructions; and (2) the ability to carry out detailed instructions.  Tr. 321.

Dr. Rivera reviewed various records when completing the Mental RFC assessment, including treatment records, Youngstown City School intelligence testing records, and the psychological evaluations from Drs. Brescia (2007), Degli (2009), and Palumbo (2010).  Tr. 323. She ultimately concluded that O'Conner was capable of simple, routine tasks, with full changes. Tr. 323.

In the Psychiatric Review Technique, Dr. Rivera concluded that O'Conner did not satisfy a Listing.  Tr. 325-34.   She did find that O'Conner had borderline intellectual functioning. Tr. 326.  When rating the "B" criteria of the Listings, Dr. Rivera found that O'Conner had mild restrictions in maintaining social functioning.  Tr. 335.  She also found that O'Conner had moderate restrictions in activities of daily living and in maintaining concentration, persistence, or pace.  Tr.  335.  There were no episodes of decompensation.  Tr. 335.

### b.  Vicki Warren, Ph.D.

On August 14, 2010, as a part of O'Conner's request for reconsideration, Vicki Warren,

Ph.D., reviewed and affirmed Dr. Rivera's May 12, 2010, Mental RFC Assessment.  Tr. 416.

Dr. Warren noted that, other than school records from the mid-1980s, there was no new psych

evidence and no allegations of worsening.  Tr. 416.

## C.     Testimonial evidence

### 1.      O'Conner's testimony

O'Conner testified and was represented by counsel at the administrative hearing.  Tr. 40,

42-58, 64-65.   O'Conner stated that he was unable to work because he loses his breath and

cannot stay on his feet long.  Tr. 49.  He loses consciousness when he has a seizure.  Tr. 49-50.

O'Conner has had seizures since he was about 14 years old.  Tr. 54.  His seizures started after a

beam fell on his head while he was setting up kiddie rides at a carnival. Tr. 54.  He could not

recall the last time he had a seizure.  Tr. 50.  After he experiences a seizure, it takes O'Conner

about 10 to 15 minutes to recuperate.  Tr.  55.

He has tingling pain in his right arm.  Tr. 50.  Sometimes, his whole arm goes numb.  Tr.

50.  He also has problems turning things, like knobs, with his right hand.  Tr. 51.  O'Conner can

stand for about one or two minutes before his legs go numb.  Tr. 50.  He can walk pretty far until

he loses his breath.  Tr. 51.  He does not have any problems with bending, stooping, or squatting.

Tr. 51.  He stated he can sit for a few minutes before having to get up and walk around.  Tr. 51.

O'Conner's wife takes care of the cooking, housekeeping and laundry.  Tr. 52.  O'Conner

shops but only with his wife. Tr. 52.  He will sometimes cut the lawn or take out the garbage.  Tr.

52.  He plays with his sons.  Tr. 52.  He watches television.  Tr. 52.  O'Conner's wife manages

the finances.  Tr. 55.  He has never had his own back account and cannot do basic math.  Tr. 55.

O'Conner does not have a driver's license and never has.  Tr. 54.  About once each day,

O'Conner gets stressed or upset when people agitate him or yell at him.  Tr. 56.  When those

types of event occur, it affects his ability to concentrate.  Tr. 56.  In order to calm down, he has

to walk away and it takes him about 10 to 15 minutes to calm down.  Tr. 56.  Although he had

not had confrontations with people in a while or at work, O'Conner indicated that, in the past, he

had been involved in verbal and physical confrontations with others.  Tr. 57.

### 2.      Vocational expert's testimony

Vocational Expert ("VE") Kevin Yi testified at the hearing.  Tr. 58-63.   The VE

described O'Conner's past work as a dock worker/stock loader and as a dishwasher.  Tr. 59-60.

The VE described the dock worker/stock loader position as an unskilled, medium exertional level

position and stated that O'Conner had performed the work at the heavy level.  Tr. 59-60.  The

VE described the dishwasher position as an unskilled, medium exertional level position.  Tr. 60.

The ALJ asked the VE to assume a younger individual who is illiterate with O'Conner's

work history who can perform light work but cannot climb ladders, ropes or scaffolds; must

avoid all hazards such as dangerous machinery and unprotected heights; can understand,

remember and carry out simple instructions; can perform simple routine tasks; requires a low

stress work environment with few changes in work settings or work processes and without strict

quotas or high production demands; and can tolerate occasional contact with the public and

coworkers.  Tr. 60.  The VE indicated that such an individual could not perform O'Conner's past

work.  Tr. 60.  However, the VE indicated that there were unskilled, light jobs available in the

regional and national economies that such an individual could perform, including: (1)

housekeeping cleaner with about 250,000 positions available nationally and about 8,000 positions available in Ohio; (2) cafeteria attendant with about 120,000 positions available nationally and about 5,000 positions available in Ohio;[8] and (3) dry cleaner with about 33,000 positions available nationally and about 1,300 positions available on Ohio. Tr. 60-61.

The VE indicated that, if the first described individual also had difficulty maintaining concentration and attention, required more than occasional supervisory intervention to remain on task, and on occasion would react inappropriately to comments and criticism from supervisors,[9] there would be no jobs available to such an individual. Tr. 61-62.

The VE also indicated that, if the first described individual could lift overhead with the dominant right upper extremity less than occasionally and could only occasionally lift chest high with the dominant right, the three listed jobs might remain available to such an individual but might require an accommodation by the employer. Tr. 62-63.

Finally, the VE indicated that, if a hypothetical individual with O'Conner's age, education and work history had symptoms that resulted in absenteeism two or more days each month, there would be no jobs available to such an individual. Tr. 63.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

---

[8] The VE indicated that the number of jobs available were reduced numbers because some of the jobs entail more than occasional contact with the public. Tr. 61.

[9] The ALJ stated that, by "inappropriately," he meant "vigorous display of anger." Tr. 61.

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[10] claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[11] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[11] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his August 24, 2011, decision, the ALJ made the following findings:[12]

1.  O'Conner met the insured status requirements through December 31, 2012.  Tr. 23.

2.  O'Conner has not engaged in substantial gainful activity since May 1, 2007.  Tr. 23.

3.  O'Conner has the following severe impairments: seizure disorder, obesity, learning disabilities and borderline intellectual functioning.  Tr. 23. O'Conner's impairments of obstructive sleep apnea, gastroesophageal reflux disease, hiatal hernia, cervical radiculopathy, asthma, plantar fasciitis, tenosynovitis, low back pain, headaches, history of cholecystitis with laparoscopic cholecystectomy, and speech impairment were non-severe.  Tr. 23-24.

4.  O'Conner does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listed impairments, including Listing 11.02 (Epilepsy -- convulsive epilepsy), 11.03 (Epilepsy -- nonconvulsive epilepsy), 12.02 (Organic Mental Disorders), and 12.05 (Mental Retardation).  Tr. 24-26.

5.  O'Conner has the RFC to perform less than a full range of light work.  Tr. 26-30.  He can never climb ladders, ropes or scaffolds; he must avoid all hazards such as unprotected heights and dangerous machinery; he can understand, remember and carry out simple instructions and perform simple, routine tasks; he requires a low stress work environment with few changes in work settings or work processes and without strict quotas or high production demands; he can tolerate occasional contact with the public and coworkers.  Tr. 26-30.

6.  O'Conner is unable to perform any past relevant work.  Tr. 30.

---

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[12] The ALJ's findings are summarized herein.

7.    O'Conner was born in 1968 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 30.

8.    O'Conner is illiterate and is able to communicate in English.  Tr. 30.

9.    Transferability of job skills is not an issue.  Tr.30.

10.   Considering O'Conner's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that O'Conner could perform, including housekeeping cleaner, dry cleaner, and cafeteria worker.  Tr. 30-31.

Based on the foregoing, the ALJ determined that O'Conner had not been under a disability from May 1, 2007, through the date of the decision.  Tr. 31.

## V. Parties' Arguments

Plaintiff's sole argument is that the ALJ erred in finding that his impairment did not meet Listing 12.05C.  Doc. 18.  O'Conner argues that he meets the requirements of Listing 12.05C and that the ALJ failed to address all of the objective, relevant evidence in reaching his conclusion with respect to Listing 12.05C.  Doc. 18.  In response, Defendant asserts that the ALJ did not err in his analysis of O'Conner's impairments under Listing 12.05C and properly considered the objective, relevant evidence.  Doc. 20.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).   Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).   Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.**     **The ALJ's decision that O'Conner did not satisfy Listing 12.05C is supported by substantial evidence**

Listing 12.05 relates to mental retardation. To qualify as disabled under that Listing, a claimant needs to satisfy <u>both</u> the diagnostic description in the introductory paragraph of Listing 12.05 <u>and</u> one of the four sets of criteria found in Subparts A through D.  20 C.F.R. § 404.1525(c)(3);  *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001).  The diagnostic description is as follows:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.[13]

The additional Subpart C criteria are:

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Part 404, Subpt. P, App. 1, Listing §12.05C.

---

[13] In order to satisfy the diagnostic description, a claimant must prove that he meets three factors: "(1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations." *Hayes v. Comm'r of Soc. Sec.*, 357 F. Appx. 672, 675 (6th Cir. 2009) (citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).  "The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills."  *Id.* at 677.

With respect to Listing 12.05C, the ALJ concluded that O'Conner did not meet the "paragraph C" criteria of Listing 12.05.  Tr. 25-26.  More particularly, the ALJ stated:

> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  In reaching this finding, I acknowledge a history of IQ scores in the mild mental retardation to borderline intellectual functioning range, including results of the Wechsler Intelligence Scale for Children in 1984 reflecting the following I.Q. scores: 75 performance, 62 verbal and 68 full-scale and results in 2007 with scores ranging from 60-76.  (1E at 27; 23F at 8)  However, I agree with psychologist Donald Degli, M.A. that the claimant's test scores are not consistent with his level of functioning, including a demonstrated ability to sustain competitive unskilled employment, a longstanding marriage, and the ability to rear children.  These scores do not appear to adequately reflect the claimant's level of cognitive functioning.  The claimant's demonstrated level of functioning supports a finding of borderline intellectual functioning and not mild mental retardation.  (33F at 3).

Tr. 25-26.

O'Conner argues that the ALJ improperly disregarded "listing-level" IQ scores, including test scores of a verbal IQ of 60, performance IQ of 76, and full scale IQ of 68 resulting from consultative examining psychologist Dr. Brescia's 2007 IQ testing.[14]  Doc. 18, pp. 9-12. However, the ALJ found that those "listing-level" scores were insufficient to establish the "paragraph C" criteria of Listing 12.05, i.e., the ALJ concluded that the scores were not valid.  In reaching his conclusion, the ALJ considered both medical and non-medical evidence.  For example, the ALJ considered and relied upon Dr. Degli's medical opinion.  Tr. 25-26.  In that opinion, notwithstanding O'Conner's test scores,  Dr. Degli diagnosed O'Conner with borderline intellectual functioning, not mental retardation.  Tr. 25-26, 562-64.  Additionally, the

---

[14] To the extent that O'Conner suggests that the ALJ ignored IQ test scores from 1974, 1979, and 1984, the ALJ acknowledged O'Conner's history of IQ scores.  Tr. 25, 28.  Further, to the extent that O'Conner asserts that the ALJ erred because he did not find the 1974, 1979, and 1984 IQ test scores, which fell within the 60-70 range, to be valid, O'Conner's argument is unpersuasive.  O'Conner was less than 16 years of age when those test scores were obtained.  Tr. 562. Thus, those test scores are insufficient to establish that O'Conner meets Listing 12.05(C).  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 126 (6th Cir. 2003) (indicating that intelligence test results obtained between the ages of seven and sixteen are considered to be current for only two years if the score is forty or above.)

ALJ considered O'Conner's demonstrated ability to sustain competitive unskilled employment, a longstanding marriage, and the ability to rear his children.  Tr. 25-26, 28.  As reflected in the record, O'Conner stopped working at his long term thrift shop job because the store closed.  Tr. 308 (Dr. Palumbo's report reflecting that "O'Conner last worked about two years ago . . . until they closed the service"); Tr. 462 (Dr. Brescia's report reflecting that O'Conner "had last worked at a job, 'since the job went out of business'"); Tr. 562 (Dr. Degli's report reflecting that O'Conner had been employed at the St. Vincent DePaul Society in a compensatory work environment until the storefront closed).  Additionally, at the hearing, when asked why he was unable to work, he indicated that he was limited physically.  Tr. 49.  More particularly, he stated: "I'm slow.  Sometimes I get slowed down because I lose my breath and sometimes I can't stay on my feet so long.  They start to swell up."  Tr. 49.

The ALJ's consideration of both medical and non-medical evidence in evaluating the IQ scores was appropriate.  "The regulations do not limit the question of validity [of IQ scores] to test results alone in isolation from other factors." *Albright v. Astrue*, 2011 U.S. Dist. LEXIS 117768, *29 (N.D. Ohio 2011) (citing *Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268, 269 (6th Cir. 1991)).  "In assessing the validity of a claimant's IQ, information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living, social functioning, concentration, persistence and pace; or ability to tolerate stress." *Albright*, 2011 U.S. Dist. LEXIS 117768, *29-30;  *see also Brooks v. Astrue*, 2010 U.S. Dist. LEXIS 27583, * 11 (N.D. Ohio 2010) (recognizing that factors outside the test itself, including daily activities and past work experiences, may be considered when determining the validity of an IQ score).

O'Conner argues that the ALJ's rationale for finding his "listing-level" IQ scores not valid conflicts with the Sixth Circuit's decision in *Brown v. Sec'y of Health and Human Servs.,* 948 F.2d 268 (6th Cir. 1991).[15]  Doc. 18, pp. 11-12.  However, *Brown* is distinguishable.  The claimant in *Brown* only completed school through the sixth grade.  In contrast, although O'Conner attended special education classes while in school, he completed high school. Further, here, unlike in *Brown*, the ALJ relied not only on O'Conner's life skills and experience, including his ability to sustain competitive unskilled employment for a significant period of time, his longstanding marriage, and his ability to rear children, but also on an opinion from a state agency consultative psychologist who evaluated the claimant, considered the record, including the IQ test scores, and diagnosed O'Conner with borderline intellectual functioning, not mild mental retardation.  *See Cooper v. Comm'r of Soc. Sec.*, 217 Fed Appx. 450, * 452 (6th Cir. 2007) (drawing a distinction between a diagnosis of mental retardation and borderline intellectual functioning); *see also See Brooks v. Astrue*, 2010 U.S. Dist. LEXIS 27583, * 17 (N.D. Ohio 2010) (finding that a divergent diagnosis, while not dispositive, is relevant evidence when considering whether an IQ score is valid).

O'Conner argues that the ALJ erred because he ignored two of the three consultative examining opinions that diagnosed him with mild mental retardation and instead accepted Dr. Degli's opinion.  Doc. 18, pp. 11-12.  His argument is unpersuasive.   The ALJ discussed all three consultative examining opinions and fully explained his reasons for the weight assigned to those opinions. Tr. 25-26, 28-29.  For example, the ALJ gave some weight to Dr. Brescia's opinion but stated that he agreed with Dr. Degli's opinion that O'Conner's test scores did not adequately reflect his ability to function.  Tr. 29.   In reaching his conclusion, the ALJ noted that,

---

[15] O'Conner also argues that the ALJ's decision is contrary to *Estle v. Comm'r of Soc. Sec.*, 2012 WL 3188768, * 9 (S.D. Ohio 2012) a Southern District of Ohio case which cited *Brown*.  However, *Estle* is not controlling.

although Dr. Brescia's IQ testing resulted in scores ranging from 60-76, Dr. Brescia opined that O'Conner had mild to moderate limitations in the ability to socially interact; that O'Conner could understand and follow simple instructions and maintain adequate attention and concentration to perform simple, repetitive tasks; and had moderate limitations in the ability to withstand work stress.  Tr. 28-29, 470.  With respect to Dr. Palumbo's opinion, the ALJ gave that opinion some weight as well.  Tr. 29.  In reaching his conclusion, the ALJ noted that, while Dr. Palumbo diagnosed O'Conner with mild mental retardation based on test scores, Dr. Palumbo estimated that O'Conner was functioning with only moderate limitations in the functional areas that were assessed.  Tr. 29, 311.   Additionally, the ALJ also considered and discussed the opinions of state agency reviewing psychologists Dr. Rivera and Dr. Warren.  Tr. 29.  Dr. Rivera's assessment reflects that she reviewed and considered all three consultative examining evaluations, O'Conner's IQ testing scores, other medical evidence of record, and reports of O'Conner's activities of daily living.  Tr. 323.  She found no listing level impairment (Tr. 325-38) but opined that O'Conner suffered from borderline intellectual functioning (Tr. 326).  She also opined that O'Conner was capable of simple, routine tasks, with few changes (Tr. 323).  Dr. Warren later affirmed Dr. Rivera's assessment.  Tr. 416.  Based on the foregoing, it cannot be said that the ALJ erred because he assigned more weight to, or relied upon, Dr. Degli's opinion over the opinions of Drs. Brescia and Palumbo.

The foregoing demonstrates that substantial evidence, including Dr. Degli's consultative examining medical opinion and O'Conner's ability to sustain competitive unskilled employment for a significant period, his longstanding marriage, and his ability to rear children, supports the ALJ's decision that he did not have a  valid listing level IQ score and thus did not meet the "paragraph C" criteria of Listing 12.05.  Moreover, even if other evidence such as Dr. Brescia's

and Dr. Palumbo's diagnoses of mild mental retardation were deemed to support O'Conner's claim that he had a valid listing level IQ score, since there is substantial evidence to support the Commissioner's decision, it should not be overturned.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Since O'Conner must show that he meets both the "paragraph C" criteria <u>and</u> the diagnostic criteria, and since substantial evidence supports the ALJ's decision that the "paragraph C" criteria were not met, it is not necessary for the Court to assess whether or not O'Conner satisfies the diagnostic description or whether the ALJ's failure to specifically address the requirements of the diagnostic description was error.

### VII. Conclusion

For the reasons set forth herein, the ALJ did not err in finding that O'Conner does not have an impairment that satisfies Listing 12.05C.  Accordingly, the Court **AFFIRMS** the Commissioner's decision.

Dated:  December 23, 2013

Kathleen B. Burke
United States Magistrate Judge